## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RICHARD WATERHOUSE,

                Petitioner,

vs.                               No. CIV-11-685 JB/CG

TIMOTHY HATCH, Warden,

                Respondent.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

**THIS MATTER** comes before the Court on Petitioner Richard Waterhouse's *Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody*, (Doc. 1), Petitioner's *Brief in Support of Petition for Relief from Conviction and Sentence by a Person in State Custody*, (Doc. 2), and *Respondent's Answer to Petition for Writ of Habeas Corpus (28 U.S.C. § 2254)*, (Doc. 11). In 2002 Mr. Waterhouse was charged with sexually molesting the minor daughter of his former wife, Carmen Spier. Mr. Waterhouse ultimately pled guilty to two counts of criminal sexual penetration in the second degree, felony offenses, in the Eleventh Judicial District in San Juan County, New Mexico. (*Id.* at 2-3). Petitioner contends that his public defender was ineffective because he did not conduct any investigation. (Doc. 1 at 5; Doc. 2). Petitioner claims that, due to his counsel's ineffectiveness, his guilty plea was neither knowing nor voluntary. (*Id.*; Doc. 2). Judge Karen Townsend in the Eleventh Judicial District Court conducted an evidentiary hearing and concluded that the habeas petition should be dismissed. (Doc. 11, Ex. DD at 1, 6). Mr. Waterhouse now seeks review of Judge Townsend's decision. The Court, having

considered the parties' filings, the record proper, the relevant law, and otherwise being fully advised in the premises, **RECOMMENDS** that the Petition be **DENIED**.

## I. Factual and Procedural Background

Mr. Waterhouse was living with his wife, Carmen Spier, and her three daughters Melissa, Andrea, and Tessa, in Farmington, New Mexico in 1997. (Doc. 11, Ex. U at 24, 59). The couple moved to Utah in 1998 and had a son, Julien. (*Id.*). In August of 1999 the couple split up and Mr. Waterhouse moved back to Farmington. (*Id.* at 24). Ms. Spier returned to Farmington with her four children in March of 2000. (*Id.*). Ms. Spier allowed Mr. Waterhouse to pick up Julien and Tesaa and take care of them on weekends. (*Id.*). Mr. Waterhouse would not pick up Melissa or Andrea. (*Id.* at 24, 59).

At some point in 2002 Melissa, then ten years old, told her mother that Mr. Waterhouse had twice molested her at their trailer in Farmington in 2000. (*Id.* at 24). Melissa repeated these allegations in a 'safehouse' interview and the San Juan County Sheriffs Department conducted an investigation into the matter. In November of 2002, a Grand Jury in the Eleventh Judicial District indicted Mr. Waterhouse on three counts of criminal sexual penetration of a minor in the first degree and one count of intimidation of a witness in the third degree. (Doc. 11, Ex. DD at 2). Mr. Waterhouse also had two other felony cases before the Eleventh Judicial District Court at that time. (*Id.* at 1-2). He was charged with bribery of a witness and receiving or transferring a stolen vehicle in one case, and with commercial burglary, larceny, and unlawful taking of a motor vehicle in the other case. (*Id.*).

2

Following his indictment for criminal sexual penetration, Mr. Waterhouse was represented by a public defender named Overzenia Ojuri. (Doc. 11, Ex. U at 75; CD 9:46:33 - 38).[1] Ms. Ojuri left the public defender's office shortly after she was assigned to the case. (Doc. 11, Ex. U at 75). Mr. Waterhouse was then represented by acting District Defender Kane Graves for a little over a month before he was fired. (*Id.*; CD 9:45:36 - 46:46). Mr. Waterhouse's case was then transferred to a third public defender named Fred Reese. (*Id.*).[2] Shortly thereafter Fred Reese left the office to become an assistant district attorney. Mr. Waterhouse's case was then assigned to Ray Archambeau, one of only two remaining felony attorneys at the Farmington/Aztec public defender office. (Doc. 11, Ex. U at 75-76).

Mr. Archambeau testified that the public defender's office was in a state of chaos at that time. He and one other felony attorney, who had a little over one year of experience, were responsible for over 400 open felony cases. (*Id.*; CD 9:47:33 - 43). Mr. Archambeau was personally overextended as three or four of his major felony cases were set to go to trial within six weeks of receiving Mr. Waterhouse's case. (*Id.* at 9:48:26 - 36).

Mr. Archambeau received Mr. Waterhouse's case file on Friday, March 28, 2003. (T4 at 0:24 - 26). Mr. Archambeau was scheduled to appear before Judge Hynes for a

---

[1] The record proper of Mr. Waterhouse's pretrial hearings was provided in the form of five numbered cassette tapes. The record of the habeas evidentiary hearing conducted before Judge Townsend in February of 2011 was provided in the form of a CD. To denote citations to these proceedings, the Court will either cite to the tape ("T") and the time stamp listed on the tape recorder and player ("00-600"), or to the CD ("CD") and time stamp listed on the FTR Record Player reflecting the hour, minute, and second (ex: "9:24:37-52"). .

[2] Mr. Waterhouse was represented a separate attorney - Randall Roberts - on the two pending car theft felonies. His representation is not at issue in this habeas petition. (Doc. 11, Ex. CC at 1, n. 1).

docket call on Monday, the 31st of March. Mr. Archambeau reviewed the entire file that weekend and he confirmed that little, if any, work had been done on the case. (CD at 10:01:31 - 53; Doc. 11, Ex. U at 76).   The file indicated that Ms. Ojuri spoke to Mr. Waterhouse once and that Kane Graves had Mr. Waterhouse brought to the public defender's office for a brief meeting in January of 2003. (CD 10:03:30 - 04:01; Doc. 11, Ex. BB at 1). There were notations in the file suggesting that Mr. Waterhouse might have some defenses but the attorney writing the notes seemed to discount them. (CD 10:02:59 - 03:14). There was no indication that the previous attorneys had listened to Melissa's safehouse interview or had interviewed Melissa or any other witnesses. (*Id*. at 9:49:19 - 37).

Mr. Archambeau appeared before Judge Hynes on Monday the 31st and he represented that he had just received the file on Friday and that it appeared Mr. Waterhouse had some potentially meritorious defenses. (T4 at 0:25 - 30). Judge Hynes asked Mr. Archambeau whether he would be ready to try the case within one week and Mr. Archambeau responded that he could not be ready within a week. (*Id*. at 0:31-37). Mr. Archambeau requested a ninety day continuance. (*Id*.).   Judge Hynes asked Mr. Waterhouse, "do you want your counsel prepared for trial or do you want a quick trial?" (*Id*. at 0:38-42). Mr. Waterhouse replied, "I want him prepared for trial."

Judge Hynes refused the request for a ninety day continuance and told Mr. Archambeau to be ready for trial within thirty days. (*Id*. at 0:43-57). Judge Hynes told Mr. Archambeau to get help from his colleagues and Mr. Archambeau explained that there was no one available to help. (*Id*. 0:57-70). Judge Hynes then appointed Brad Dalley, a private

criminal defense attorney sitting in the audience of the courtroom, to assist Mr. Archambeau in preparing the case for trial. (Doc. 11, Ex. U at 76, 79).

Mr. Archambeau and Mr. Dalley met and divided the work. Mr. Archambeau arranged to have Melissa available for an interview. (CD 9:50:26 - 59). Mr. Archambeau also spoke with several police witnesses over the phone but didn't remember what they said. (*Id.* at 10:10:36-59). Mr. Archambeau did no other work on the case - he never met with Mr. Waterhouse at the jail and he never spoke with any other witnesses. (*Id.* at 9:51:20-52; 10:12:3-47).

Mr. Dalley met with Mr. Waterhouse to familiarize himself with the case, he watched the safehouse interview, and he interviewed Melissa. (*Id.* at 10:21:10-18). Mr. Waterhouse swore that he had an alibi defense and that he was innocent. (*Id.* at 10:23:11-14; 11:23:50-24:04). Mr. Dalley did not investigate Mr. Waterhouse's alibi defense because he didn't have enough time or resources. (*Id.* 10:23:16-40). Mr. Dalley's impression of Melissa was that she was credible and consistent. (*Id.* 10:40:13-54).

Approximately a week after Mr. Archambeau and Mr. Dalley were assigned to the case, the District Attorney offered Mr. Waterhouse an *Alford* plea.[3] Under the terms of the plea offer, Mr. Waterhouse would plead guilty to two counts of criminal sexual penetration in the second degree and the district attorney would dismiss the remaining two counts in the case and the other felonies. (Doc. 11, Ex. B at 1-3). The terms of the plea offer reduced Mr. Waterhouse's potential prison exposure from 103.5 years in prison to 26 years. (Doc.

---

[3] *North Carolina v. Alford*, 400 U.S. 25, 37 (1970) (an *Alford* plea allows a defendant to plead guilty and "consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.")

11, Ex. DD at 2-3). When Mr. Dalley informed Mr. Archambeau that they had a plea offer, Mr. Archambeau stopped working on Mr. Waterhouse's case because he had other cases that needed his attention. (*Id.* at 9:51:16-20; 9:52:43-58).

Mr. Dalley had no time to do any other investigation after the plea offer was received. When he presented the plea offer to Mr. Waterhouse, he felt that "no one had done anything to really formulate a defense." (CD at 10:33:45-50). According to Mr. Dalley, a trial would come down to Mr. Waterhouse's word against Melissa's. (*Id.* at 10:44:29-37). Despite Mr. Waterhouse's continued assertions of innocence, Mr. Dalley advised him that they did not have a theory of defense and that, because Melissa seemed credible, Mr. Waterhouse would likely lose at trial. (*Id.* at 10:34:15-35:03).

Mr. Dalley described Mr. Waterhouse as being "upset, anxious, [and] highly agitated." (*Id.* at 11:26:26-52). Mr. Waterhouse seemed "like a coyote in a trap . . . his choice was to go to trial on a case he would lose and do a whole bunch of prison time or take his least worst option which was chewing off his leg to get out of the trap." (*Id.* at 11:26:30 - 27:24). Mr. Waterhouse agreed to plead guilty so long as he could enter an *Alford* plea.

Mr. Waterhouse pled guilty on April 25, 2003, and was sentenced by Judge Hynes on August 23, 2003. (Doc. 11 at 2). Mr. Waterhouse was sentenced to nine years in prison for each count and a four year habitual offender enhancement. (Doc. 11, Ex. A at 1-2). Mr. Waterhouse received a 22 year sentence with four years suspended. (*Id.* at 2).

### a.   Direct Appeal

Mr. Waterhouse appealed his conviction, arguing that he did not receive a fair sentencing hearing. (Doc. 11, Ex. F). Sue Hermann, the Appellate Defender, represented

Mr. Waterhouse on his appeal. (Doc. 11, Ex. U at 70). Mr. Waterhouse told Ms. Hermann that he was innocent and, though the appeal focused solely on the issue of unfair sentencing, she began investigating the circumstances behind his decision to plead guilty. (CD 1:34:50-35:08; 35:21-32). Ms. Hermann discovered evidence which would have supported Mr. Waterhouse's claims of innocence.

First, she found Mr. Waterhouse's alibi claim to be partially credible. The criminal complaint alleged that Mr. Waterhouse had molested Melissa sometime between February and June of 2000. (Doc. 11, Ex. U at 71). Ms. Hermann called Mr. Waterhouse's mother, who had never been contacted by the defense, and she confirmed that Ms. Spier and the children did not come back to New Mexico before March 6, 2003, and that Mr. Waterhouse had no access to Melissa before then. (Doc. 11, Ex. U at 59-60, 71).

Ms. Hermann also discovered that a public defender investigator named Ken Ellison interviewed Ms. Spier on the same day that Mr. Waterhouse pled guilty. (*Id.* at 72). Ms. Spier told Ellison that she no longer believed her daughter's story because Melissa had waited two years before reporting the purported molestation and because her story was inconsistent. (*Id.*). Melissa had originally told her mother that she was molested in Utah, but later changed her story and claimed that the abuse occurred in New Mexico. (*Id.*). As Ms. Hermann testified at the evidentiary hearing, "had [Mr. Archambeau and Mr. Dalley] known, at that point, what Mr. Ellison learned in his interview, they would have realized that there was a valid defense - that [Ms. Spier] did not believe her own daughter . . . and never really believed that Mr. Waterhouse did anything to her daughter." (CD at 1:52:05-58).

In reviewing Mr. Waterhouse's plea allocution, she also discovered that Mr. Archambeau and Mr. Dalley had misrepresented Mr. Waterhouse's likely sentencing

exposure. They incorrectly promised that the provisions of the Earned Meritorious Deduction Act ("EMDA"), N.M.S.A. 1978 § 33-2-34, would not apply to him. (Doc. 11, Ex. U at 70-71). The EMDA provides that those convicted of serious violent offenses are only eligible to receive four days of good time credit per month of incarceration, meaning that a violent offender will always have to serve at least 85% of their sentence. N.M.S.A. 1978 § 33-2-34(A)(1). Mr. Waterhouse's attorneys told him that he would be eligible to receive one day of good time credit for every day of incarceration and that he might only serve 50% of his sentence. (Doc. 2 at 6). However, the EMDA does apply to Mr. Waterhouse's sentence and he must therefore serve 85% of his sentence. (Doc. 11, Ex. U at 71).

Although Ms. Hermann had serious concerns about the quality of representation that Mr. Waterhouse received, she advised him that any claim of ineffective assistance of counsel would likely have to be brought in a habeas petition. (CD 1:33:24-34:13). The direct appeal was therefore limited solely to the question of whether Mr. Waterhouse received a fair sentencing hearing. (Doc. 11, Ex. L at 5-10). The appeal was denied by both the New Mexico Court of Appeals and the New Mexico Supreme Court. (Doc. 11, Ex. G at 1-3; Ex. N).

### b.   State Habeas Petitions

Following the denial of his direct appeal, Mr. Waterhouse filed a habeas petition before Judge Hynes in the Eleventh Judicial District Court alleging that his trial attorneys were ineffective for failing to investigate his case and for failing to correctly advise him of his sentencing exposure. (Doc. 11, Ex. P at 10-14). He also argued that Judge Hynes violated his due process rights by refusing to give Mr. Archambeau and Mr. Dalley sufficient

time to prepare the case. (*Id.* at 14-16). Judge Hynes summarily denied the petition in July of 2007. (Doc. 11, Ex. Q).

Mr. Waterhouse did not appeal the denial but instead filed an amended habeas petition before state District Judge Karen Townsend. (Doc. 11, Ex. R at 1). He asserted that his attorneys were ineffective for failing to investigate, failing to consult with or retain expert witnesses, failing to present mitigating evidence at sentencing, and for misrepresenting that applicability of the EMDA to his sentence. (*Id.* at 7-22). He again alleged that Judge Hynes' refusal to provide Mr. Archambeau and Mr. Dalley with sufficient time to prepare violated his due process rights. (*Id.* at 22-24).

Judge Townsend denied the petition in July of 2008. (Doc. 11, Ex. T at 1). She found that Mr. Archambeau and Mr. Dalley were not ineffective and that their investigation was sufficient. (*Id.* at 3-4). She agreed that Mr. Waterhouse's attorneys were ineffective for advising him that the EMDA did not apply, but found that Waterhouse was not prejudiced by this error because he would have pled guilty even if he knew he would have to serve 85% of his sentence. (*Id.* at 6-7).

Mr. Waterhouse applied for a writ of certiorari with the New Mexico Supreme Court and, in March of 2010, the Court reversed Judge Townsend's decision and remanded the case to her with instructions to conduct an evidentiary hearing. (Doc. 11, Ex. U at 2-10; Ex. Y at 6-19; Ex. AA at 1-2). The evidentiary hearing was held on February 28, 2011 and Mr. Archambeau, Mr. Dalley, Ms. Bermann, and Brian Pori - an appellate attorney who prepared Mr. Waterhouse's amended habeas petition - testified on Mr. Waterhouse's behalf. Mr. Waterhouse did not testify. (Doc. 11, Ex. DD at 4). The state called the social

worker who conducted the safehouse interview and a detective from the San Juan County Sheriff's Department.

After considering the testimony, Judge Townsend again dismissed the amended habeas petition. (*Id.* at 6). She found that, even assuming that his attorneys were ineffective, Mr. Waterhouse had not shown that, but for these errors, he would have rejected the plea agreement and insisted on going to trial. (*Id.* at 4-5). Following Judge Townsend's decision, Mr. Waterhouse petitioned for another writ of certiorari to the New Mexico Supreme Court. (Doc. 11, Ex. EE at 1-11). The Supreme Court denied the petition as well as his subsequent motion for reconsideration.  (Doc. 11, Ex. FF; Ex. II). Mr. Waterhouse then timely filed the instant habeas petition in this Court.

## II.    Standard of Review

### a.    Review under 28 U.S.C. § 2254

A petition for habeas corpus under 28 U.S.C. § 2254 attacks the constitutionality of a state prisoner's conviction and continued detention. The Antiterrorism and Effective Death Penalty Act of 1996 establishes the requirements for granting a write of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim,
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

28 U.S.C. § 2254(d). These regulations were intended to ensure that state court decisions "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The AEDPA standard is "highly deferential" to state courts and the Supreme Court has added

that the standard is "difficult to meet." *Cullen v. Pinholster*, ---- U.S. ----, 131 S. Ct. 1388, 1398 (2011) (citing *Harrington v. Richter*, 562 U.S. ----, 131 S. Ct. 770, 786 (2011)).

The term 'clearly established Federal law' "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state decision is "contrary to" Supreme Court precedent if it "'applies a rule that contradicts the governing law set forth in [those] cases.'" *Id.* at 405. The Supreme Court has interpreted the term "contrary to" as meaning, *inter alia*, "diametrically different" and "opposite in character and nature." *Id.* Therefore, habeas relief under § 2254 may only be had if the state court "applies a rule that contradicts the governing law set forth in Supreme Court cases"; or if it "confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent." *Price v. Vincent*, 538 U.S. 634, 640 (2003).

A state decision is an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams,* 529 U.S. at 413. However, "it is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court" applied "clearly established federal law erroneously or incorrectly." *Lockyer v. Andrade* 538 U.S. 63, 75-76 (2003) (internal quotations and citations omitted). "Rather, that application must be objectively unreasonable." *Id.* When the legal principle implicated by the petition is general in nature, state courts are given greater leeway in interpreting the principle in light of Supreme Court precedent  *Harrington v. Richter*, 562 U.S. ----, 131 S. Ct. 770, 788 (2011).

Finally, a state decision rests on an "unreasonable determination of the facts" where it is shown by "clear and convincing evidence," that the factual finding is erroneous. 28 U.S.C. § 2254(e)(1); *Wiggins v. Smith,* 539 U.S. 510, 528 (2003).

      **b.**    **Ineffective Assistance of Counsel**

To establish ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. First, he must show that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Judicial scrutiny of counsel's performance is highly deferential; thus, the petitioner must overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* at 689. Second, the petitioner must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* "In the guilty plea context, to establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's error, the defendant would have insisted upon going to trial." *United States v. Silva*, 430 F.3d 1096, 1099 (10th Cir. 2005) (citing *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985)).

In considering the two-prong *Strickland* test, the Court may proceed directly to the prejudice prong of the analysis if that is more convenient. *Id.* at 697 ("If it is easier to dispose of an effectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is easier to resolve.").

12

### III.   Analysis

Mr. Waterhouse identifies four instances in which his attorneys provided ineffective assistance of counsel. The first three claims relate to his attorneys' failure to investigate his case. The fourth concerns his counsel's failure to correctly advise him of the EMDA's effect on his likely prison sentence. He alleges that, but for these failures, he would not have pled guilty and would have insisted on going to trial. (Doc. 1 at 5; Doc. 2).

In denying Mr. Waterhouse's amended habeas petition, Judge Townsend "assum[ed], without deciding," that Mr. Waterhouse had established the first prong of the *Strickland* test by showing that his attorneys' performance was objectively unreasonable. (Doc. 11, Ex. DD at 4). She nevertheless found that Mr. Waterhouse had failed to show that he was prejudiced by their deficient performance. (*Id.* at 4-5). She reasoned that he had failed to produce evidence demonstrating that a more thorough investigation or accurate sentencing information would have changed his decision to plead guilty. (*Id.*)  She instead focused on the bargain he received in pleading guilty: the two car theft felonies were dismissed and the criminal sexual penetration counts were reduced to second degree felonies, thereby reducing his potential prison sentence from over 100 years to no more than 26. (*Id.* at 1-3). The question for this Court is whether Judge Townsend's prejudice analysis is contrary to, or an unreasonable application of clearly established Supreme Court precedent.

### a.   Failure to Investigate

Mr. Waterhouse claims that an adequate investigation of his case would have revealed exculpatory information which tended to discredit Melissa's accusation. First, he

claims that, had his attorneys interviewed Ms. Spier, they would have discovered that Melissa had changed her story at least once and that Ms. Spier no longer believed her daughter's claim. (Doc. 2 at 5, 7). Second, they would have discovered that Mr. Waterhouse had an alibi defense and that he had no access to Melissa during the period charged in the indictment. (*Id.* at 7). Third, had defense counsel hired an expert psychiatric witness and obtained Melissa's records from school, counselors, social workers, law enforcement, and the New Mexico Children, Youth and Families Department ("CYFD"), counsel would have been able to challenge her credibility at trial. (*Id.* at 2-3, 13-14).

When an attorney's ineffectiveness is due to a failure to investigate the case or discover exculpatory evidence, a showing of prejudice will "depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). "This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial." *Id.* While a petitioner need not show that, but for his counsel's failure to investigate, he would have been acquitted at trial, the Court must examine the exculpatory value of the undiscovered evidence to determine whether it would have convinced the petitioner to reject a plea offer and proceed to trial. *Miller v. Champion*, 262 F.3d 1066, 1072-75 (10th Cir. 2001); *Romero v. Tansy*, 46 F.3d 1025, 1033 (10th Cir. 1995) (noting that, to show prejudice, a habeas petitioner must show what evidence a reasonable investigation would have uncovered and how that would have altered the petitioner's decision to plead guilty).

### i.   Failure to Interview Ms. Spier

Mr. Archambeau and Mr. Dalley never met or attempted to speak with Ms. Spier after they were assigned to Mr. Waterhouse's case. However, on the day that Mr.

Waterhouse pled guilty, a public defender investigator named Ken Ellison spoke with her and found out that Ms. Spier no longer believed her daughter. (Doc. 11, Ex. U at 72). Ms. Spier stated that she no longer believed Melissa's story because, a) she gave inconsistent accounts about where the molestation occurred, and b) she did not report the abuse until two years later. (*Id.*).

In denying the habeas petition, Judge Townsend did not specifically address the import of Mr. Ellison's interview with Ms. Spier - she simply declared that Mr. Waterhouse "did [not] adduce additional evidence, that with a better investigation or better information he would have declined the State's plea offer and opted for trial." (Doc. 11, Ex. DD at 5). Despite the fact that Judge Townsend did not explain her reasoning, the decision is still entitled to AEDPA deference. *Harrington v. Richter*, 562 U.S. ----, 131 S. Ct. 770, 784 (2011) ("When a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing that there was no reasonable basis for the state court to deny relief."). This Court "must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether is possible fairminded jurists could disagree that those arguments or theories are inconsistent with [established Supreme Court precedent]." *Id.* at 786 (reaffirming that, so long as "fairminded jurists could disagree" as to the correctness of the court ruling, a federal court is precluded from granting habeas relief); *see also Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

The Court need not look far to determine Judge Townsend's reasoning for downplaying the exculpatory value of Ms. Spier's supposed belief that her daughter was

lying.  In her first order dismissing the amended habeas petition, Judge Townsend stated that,

> Petitioner does not offer affidavit evidence that the victim's mother actually held this opinion. If known, the mother's opinion would only have been useful to possibly impeach the victim's testimony at trial. The mother herself may have been impeachable as a witness. Her opinion did not create an affirmative defense nor can it realistically be seen as evidence that could have exonerated the Petitioner as he now contends.

(Doc. 11, Ex. T at 4-5). The Court is compelled to agree with Judge Townsend that the discovery of this evidence, while helpful to the defense, would not likely have convinced Mr. Waterhouse to reject the plea offer and proceed to trial.

Firstly, there is no likelihood that Ms. Spier would have been allowed to testify to her subjective belief that her daughter was not telling the truth. While she would have been able to testify that Melissa initially told inconsistent stories about where she was molested, that would have only provided impeachment evidence. The Supreme Court has noted that impeachment evidence differs from exculpatory evidence in that it is not "critical information of which the defendant must always be aware prior to pleading guilty given the random way in which such information may, or may not, help a particular defendant." *United States v. Ruiz*, 536 U.S. 622, 630 (2002). While the issue in *Ruiz* was whether the prosecution has a duty to disclose impeachment evidence in its possession prior to entering into a plea agreement, it is notable that the Court spoke of impeachment evidence  as "special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." *Id.* at 629 (emphasis in original); *see also Manzullo v. People of New York*, 2010 WL 1292302, at *6 (E.D. NY. March 29, 2010) ("Petitioner also contends that his plea was involuntary because . . . he was not aware of new evidence that would potentially speak to the credibility of the

victim. Even if Petitioner were aware of this information at the time of his plea, it would not tend to exculpate him, but merely provide ammunition for impeachment of the prosecution's witness."); *United States v. Garcia*, 57 F. App'x 486, 489 (2d Cir. 2003).

Fairminded jurists could certainly disagree as to whether the evidence uncovered by Mr. Ellison would have been enough to convince Mr. Waterhouse to reject the plea offer and proceed to trial. For that reason, the Court is required to uphold Judge Townsend's decision that the failure to interview Ms. Spier did not prejudice Mr. Waterhouse. *Richter*, 131 S. Ct. at 786 (noting that federal courts may only provide habeas relief "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents . . . .[H]abeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.") (internal citation omitted).

### ii.    Failure to Investigate Alibi Defense

Mr. Waterhouse claims that he had an alibi defense that was never investigated by his attorneys until Ms. Hermann was assigned to represent him on direct appeal. (Doc. 2 at 7; *see also* CD at 1:47:15; 2:07:38-08:04 (Ms. Hermann testified that Mr. Waterhouse told Mr. Archambeau and Mr. Dalley about his alibi and they did not investigate it)). Specifically, Mr. Waterhouse told Ms. Hermann that he was not living with Ms. Spier at the time that the molestation supposedly occurred and that they weren't living in the same state for part of the period charged. (Doc. 2 at 7; Doc. 11, Ex. U at 71). The indictment charged that the molestation had occurred sometime between February and June of 2000. (Doc. 11, Ex. U at 71). However, Ms. Hermann's investigation revealed that Ms. Spier did not return to New Mexico until March 6, 2000. (Doc. 11, Ex. U at 63, 65-66, 71).

Judge Townsend did not specifically address the potential alibi evidence in her second order dismissing the amended habeas petition. However, Judge Townsend's first order dismissing the habeas petition provides insight into her reasoning. She noted that, while Mr. Waterhouse may have had an alibi for the period between February 1 and March 6, 2000, there was no doubt that Mr. Waterhouse had access to Melissa between March 6 and June of 2000. (Doc. 11, Ex. T at 4). Ms. Hermann's own investigation of the alibi defense confirmed that, during the charging period, Mr. Waterhouse would go to Ms. Spier's trailer and pick up his son Julien and step-daughter Tessa so that he could take care of them on the weekends. (CD at 1:46:29-47:11). Judge Townsend found that, regardless of whether Mr. Waterhouse was living with Ms. Spier between March and June of 2000, he had access to Melissa during that time.

The evidence that Ms. Spier did not return to New Mexico until March of 2000 was not particularly exculpatory and would not likely have provided powerful evidence of innocence at trial. As such, Judge Townsend's decision that  the failure to investigate the alibi defense would not have changed Mr. Waterhouse's decision to plead guilty is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

### iii.   Failure to Consult Expert Witnesses

Mr. Waterhouse claims that his attorneys were ineffective for failing to consult with any expert witnesses. (Doc. 2 at 2-3; 13-14). He contends that child sex abuse cases frequently come down to the issue of credibility and that expert testimony is crucial to determine whether the child victim was being subtly influenced by the interviewer's question or whether the child had a motive to lie. (*Id.* at 13-14). Mr. Waterhouse notes that Melissa

18

accused her father, Joel Lane, of molesting her in 2005 and that Brad Dalley, who was Mr. Lane's attorney, got a psychiatrist to evaluate Melissa. (*Id.* at 3). Mr. Lane was found not guilty on all counts and Mr. Waterhouse contends that it was partially due to the expert witness concluding that Melissa lied to get what she wanted. (*Id.*).[4] Mr. Waterhouse argues that the same level of investigation should have been done in his case.

It is certainly true that Mr. Waterhouse's attorneys did not consult an independent psychiatrist or psychologist to examine Melissa. Both Mr. Archambeau and Mr. Dalley testified that, in child sex abuse cases, the lawyer should have an expert examine the victim and review all relevant social, physical and psychological records. (CD at 9:53:35 - 56:00; 10:24:18 - 26:15). While these failures may constitute deficient performance under the first *Strickland* prong, Judge Townsend rejected Mr. Waterhouse's petition because she found that Mr. Waterhouse had not established prejudice. Therefore the question is whether Mr. Waterhouse has demonstrated that, but for the failure to obtain psychiatric testimony, he would not have pled guilty. Mr. Waterhouse must explain what the expert witness would have discovered and how this would have affected his decision to plead guilty or go to trial. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) He has not done so.

Mr. Waterhouse has amply shown that his attorneys were ineffective for failing to have an expert interview Melissa or review the tape of her safehouse interview. What he has not done is explain what the expert would have concluded about Melissa. He has not provided any evidence or affidavits from experts who can state what they might have

---

[4] *See* http://www2.nmcourts.gov/caselookup (Click on "Case Number Search" hyperlink and Type D-1116-CR-200500898 into "Full Case Number"). The "Register of Actions Activity" heading indicates that Mr. Lane received a directed verdict on 3 of the counts and that he was acquitted of the other four counts.

concluded from the safehouse interview or what they might have testified to at trial. Mr. Waterhouse asks the Court to speculate as to whether an expert would have found Melissa to be untruthful - a finding contradicted by Mr. Dalley, who thought that Melissa seemed credible in her safehouse interview - and whether that expert's opinion would have convinced Mr. Waterhouse to reject the plea offer. This the Court cannot do. *See, e.g., George v. Smith*, 586 F.3d 479, 485 (7th Cir. 2009) (stating that "without the testimony from [certain] witnesses, it would be pure speculation to conclude that [the] defense was prejudiced by his counsel's failure to present their testimony."); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (rejecting ineffectiveness claim for failure to call an arson expert where defendant did not introduce evidence that an expert would have testified on his behalf and what he would have testified to); *Grigby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (holding that pure speculation as to what an expert would testify to insufficient to establish prejudice) .

Mr. Waterhouse has cited two cases to support his claim that his attorneys were ineffective for failing to consult with an expert witness, *Gersten v. Senkowski*, 299 F. Supp.2d 84 (E.D. N.Y. 2004); and *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir. 2001). Both of those cases are factually distinguishable from Mr. Waterhouse's case. In *Pavel*, a father was convicted of sexually abusing his two young sons repeatedly over several months. The Second Circuit found that Mr. Pavel's attorney was deficient for, *inter alia*, failing to consult with or retain a medical expert to demonstrate that the boys' physical exam demonstrated no evidence of anal trauma. *Pavel*, 261 F.3d at 224-25. In support of his habeas petition, Mr. Pavel submitted the affidavit of Dr. Margaret McHugh, a physician with extensive experience in evaluating child sexual abuse, wherein she stated unequivocally that the

medical evidence was in no way consistent with sexual abuse. *Id.* at 227-28. Similarly, in *Gersten*, petitioner submitted affidavits from a pediatric doctor and forensic psychologist explaining how, a) the medical findings were not consistent with the repeated sexual abuse alleged by the child victim, and b) calling into question the validity of the 'Child Sex Abuse Accommodation Syndrom.' *Gersten*, 299 F. Supp. at 95, 103-105. In both cases the reviewing court was able to specifically consider what expert medical advice could have been presented by the defense and assess the degree to which the absence of that evidence prejudiced the petitioner's case.

In Mr. Waterhouse's case, the Court has no information regarding what expert witness could have been retained and what they might have said. Therefore, based on the record presented to Judge Townsend, the Court cannot say that Mr. Waterhouse has adequately demonstrated that he was prejudiced by his attorneys' failure to consult with or retain an expert witness.

### b.   Erroneous Sentencing Advice

Mr. Waterhouse's fourth claim of ineffective assistance centers on the erroneous advice he received concerning the EMDA. As stated above, his attorneys incorrectly promised him that he would be eligible to receive one day of good time credit per day of incarceration and that he potentially would only have to serve 50% of his sentence. (Doc. 1 at 5; Doc. 2 at 6, 16-17). However, because Mr. Waterhouse was subject to the strictures of the EMDA, he will in fact have to serve at least 85% of his sentence. (Doc. 2 at 16).

Judge Townsend agreed that Mr. Archambeau and Mr. Dalley's advice regarding the EMDA was clearly erroneous, but she nevertheless found that this error was not prejudicial. (Doc. 11, Ex. DD at 5). Specifically, she found that Mr. Waterhouse "never

showed that he placed a particular emphasis on that eligibility in deciding whether to plead guilty." (*Id.*). She also noted that the erroneous advice would not have affected his decision to plead guilty because he "was equally misinformed about good time eligibility whether he was sentenced pursuant to a guilty plea or . . . after conviction at one or more trials . . . [and therefore the advice] did not inappropriately overemphasize the benefits of the plea option as compared to option to proceed to trial." (*Id.* at 5 n. 1). The Court concurs.

Mr. Waterhouse has asserted multiple times that his primary reason for pleading guilty was because his attorneys had not investigated his case and he believed that he would be convicted at trial. (*See, e.g.*, Doc. 11, Ex. Y at 7 (Mr. Waterhouse asserted to the New Mexico Supreme Court "that he was ultimately persuaded by his trial counsel to enter a plea of guilty, even though he consistently maintained his innocence, because he felt that his appointed attorneys were completely unprepared for trial and unwilling to investigate alibi witnesses and documentary evidence . . .")). When Mr. Daelly brought the plea offer to Mr. Waterhouse, he advised him to plead guilty primarily because of a lack of a viable defense, stating

> Look man, to me it looks like these are your two choices: you take this plea and it does whatever it does and you don't have to say that you did it . . . or you can go to trial on the first degree criminal sexual penetration of a minor case and it's going to be from what I can tell your word against hers and we can all guess where that's gonna go because there is nothing else that the defense is going to put on that's going to indicate anything else.

(*Id.* at 10:34:15-35:03).

Mr. Dalley did not testify that Mr. Waterhouse placed much emphasis on whether the EMDA applied when deciding whether to plead guilty. (CD 11:39:16-40:02).[5] This is not

---

[5] Mr. Archambeau was never asked about his advice regarding the EMDA at the evidentiary hearing. (CD 11:36:25-39).

surprising considering that Mr. Waterhouse felt that his decision was to either accept a plea offer with a maximum sentence of 26 years, or risk likely conviction at trial and over 100 years incarceration. Whether Mr. Waterhouse realized he would have to serve 85% of those 26 years as opposed to only 50%, there is no doubt that it was a better option than facing many decades in jail following conviction at trial. Mr. Waterhouse has not shown that, but for his attorneys' error regarding the EMDA, he would have rejected the plea offer and would have decided to go to trial.

## IV.   Conclusion

There can be no doubt that Mr. Waterhouse's multiple attorneys failed to subject his case to the "meaningful adversarial testing" contemplated in *Strickland v. Washington*, 466 U.S. 668, 686 (2000). The first three attorneys assigned to him did not investigate the case. His last two attorneys made some effort but failed to develop a defense. When faced with the Hobson's choice of either accepting the state's plea offer - a plea offer that substantially reduced his possible sentence from over 100 years to only 26 - and the likelihood of being convicted at trial, it is not surprising that Mr. Waterhouse felt he had no choice but to plead guilty.

Unfortunately for Mr. Waterhouse, a determination that his attorneys failed to adequately represent him is not the end of the this Court's inquiry. He must show that, but for his counsel's failures, he would not have chosen to plead guilty and would instead have gone to trial. This requires a clear showing that exculpatory information would have been found such that he would have forgone the benefit of the plea bargain and would instead have taken his chances at trial. *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985). He must do so

while also surmounting the substantial deference that Judge Townsend's decision is due. Mr. Waterhouse has failed to do so in this case.

The only concrete facts that Mr. Waterhouse has established could have been discovered with adequate investigation was the fact that Melissa had originally told inconsistent stories about the molestation, that at some point Ms. Spier decided she no longer believed her daughter's story, and that Mr. Waterhouse had a partial alibi. As noted, none of these facts were particularly exculpatory or even admissible at trial. The Court is required to defer to Judge Townsend's determination that a more thorough investigation would not have changed Mr. Waterhouse's decision to plead guilty.

**IT IS THEREFORE RECOMMENDED** that Mr. Waterhouse's *Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody*, (Doc. 1), be **DENIED**.

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

_____

THE HONORABLE CARMEN E. GARZA
UNITED STATES MAGISTRATE JUDGE